Case 14-3791, Charles Byrne et al. v. CSX Transportation Inc. et al. Oral argument, 15 minutes per side. Mr. Palmer for the appellants. Good morning, Your Honors. May it please the Court? My name is Brian Palmer, Counsel for Appellant. I'd like to reserve three minutes for rebuttal, if that's acceptable. You may. My first question, and I just recently asked the Clerk this, is this is a second appeal. And I understand the administrative rules were going to assign the second appeal to the same panel as the first appeal. Certainly this is a qualified panel, but I didn't know whether that was a procedural requirement that we should meet or not meet. No, it's not required. I don't know the process. The original panel, under such circumstances, has the option to do it. But it may say the issue is different now. Certainly. We got it. You're stuck with us. Very good. The first issue is relevant to that point, though, because the first issue for the appellants is scope of remand. The Court, the last time the District, the Court said, this Court said, it's the District Court's choice whether to wade through this confusion of the affidavits. There was no affidavit, by way of summary in the materials, there was no affidavit put in the record in the first trial court. There was an attempt to put three different affidavits into this Court of Appeals. Well, that sentence comes at the end of a long paragraph where they're talking about exhibits D, E, and F, and something wasn't copied to something else. Right. And I've got the thing in front of me, and then they sort of snarf at the defendants, saying whether it's inadvertent, but they say it's the District Court's choice whether to wade through this confusion. And I read the confusion as everything above it, and so the District Court, in this case, did choose to wade through it. I understand. Certainly, I mean, this Court knows how to make a limited remand. Fair enough. You could have done that. And I guess I misunderstood that. I didn't realize it opened it up for, there was a new affidavit from a new witness that wasn't party and an extensively larger affidavit. And the one concern I had was that the trial judge actually didn't even allow us to question the witness Kirkland about any of the three exhibits that were attempted to put into the Court. But we'll move on with that, because it certainly seems to be within the... What you call the new exhibits are the revised OBC proposal, the Downs affidavit, and the other Conrail bills. I mean, I made a chart of what, I tried to make a chart of what came in at which point, and those were the three that, to me, didn't look as though something had been in earlier. But the Kirkland affidavit contained 66 new pages and a completely different section of material about what she was testifying that she had appeared to be documents that were in her file. And there was a, Matthew Downs was not in the record at all. It was a brand new witness. And actually, his testimony was taken 18 months before our accident even happened, so he certainly existed. They were aware of it, but it was a brand new person that wasn't even contemplated at the first time the summary judgment was made by the defense. The significant point for the plaintiffs, though, is that ultimately, when we look at the affidavit, all of the versions, whatever version we look at, they all say essentially the same thing. These appear to be documents of my program. These appear, and actually, the beginning, you can't overlook the beginning of the language. The language she says is, to the best of my knowledge, these are documents. And we were allowed an opportunity to pose her. And she said, I cannot say the critical documents, document L and document K, the sheet that actually showed that this was upgraded, ever got to her department. Those are the two documents, document L being the actual bills. They do have Conrail headings on them. But she also testified, and there's extensive cross-examination on this, because I needed to know the details of how it was done. How it's done, Your Honors, is a lawyer comes to her with a package of documents and says, would you verify this? And then she goes through and checks the documents one by one, and if the documents are in fact there, she doesn't ask why they're there. She just, in fact, does a rubber stamp. All the documents are there. I will start by saying it appears to be, to the best of my knowledge, these are part of the program. Then she concludes. Wait a minute. I'm getting confused. Sure. Are you talking about preparing for this affidavit or at the time certifying things to get payment? You've lost me. Oh, I apologize, Your Honor. I'm talking about preparing for this affidavit. Back at the time, and this is very important testimony for this Court, back at the time she testified, if a document was to come into her office, she would either stamp it and it would say received by the Ohio Rail Development Commission, or she would sign it, make some notation. So she's able to independently look at the documents, specifically Exhibit L and K, and say that from the face of those documents, those are not documents that she can verify came into her commission. They might have. Just help me here because there are different labels. The two that I've been looking at are the Conrail Corporation Accounts Receivable that has the Conrail logo on it, and then there is a schedule attached to it, one portion of which is the code number for Ulsh Road. Is that either K or L? And if so, which one? Very good question, Your Honor. Page ID 290678. 2908. Is it 2908 or 29? 2906, 2907, 2908. Oh, okay. Very good. Yes, the testimony in this is very significant. On the first page, she says these are the type of bills. That's what she says. But is this K or L? Oh, that's L. That's L. Okay. That's what I thought, but I wanted to be sure. And then what I have been thinking of as K is the one page that says Ohio Buckeye Cross Buck Program, specifically says Ulsh Road. Yes. All right. And that's K. That's correct, Your Honor. All right. Go ahead. Now we're on the same page. Very good. I'm bringing your Court's attention back to the 2906 that you brought my attention to. It is very significant to look at this document because I guess this would be the critical document that would or would not evidence payment. On the face of this document, it's been altered. Defense wants to call it a typo. We have no evidence whether it's a typo or altered, when it was changed, how it was changed, who changed it, did it change before it got to? What is the alteration or the typo you're referring to? The vendor number on top. The second number is obliterated. It looks like a 191-680. And if you look at the bottom of the document, it clearly says 191, excuse me, 161-680. So is there evidence one way or another who those numbers refer to? That's a great point, Your Honor. Susan Kirkland was not able to identify that 191-680 was in fact Conrail. By using circumstantial evidence, we can assume that's correct because there's 19 of these bills. And 16 other ones have the, excuse me, 15 other ones have the one. I guess counsel, I mean, help me here. Are you seriously arguing that these are in some way forged or are for other cross bucks that aren't what they say they are? Or are you just saying, look, it's up to them to dot every I and cross every T, and if we can undermine it, we don't have to have any alternative theory? Not in any way suggesting that they're forged. I'm simply suggesting that under preemption, they have a duty to prove that it's paid. There's no question the majority of cross bucks in the state of Ohio got paid through federal funds. There's no question about that. But aren't these really nothing more than pieces of evidence for the court to review and decide whether it wants to take those as evidence in order to make the court's determination? They are pieces of evidence. Is there a follow-up? But I think the fault in terms of the analysis of Judge Katz, as a learned judge, the fault, I believe, in his analysis lies in his statement that Kirkland says that these appear to be documents that were in the Buckeye Crossback Program. Nobody has ever said where this came from, right? No, that's not correct, Your Honor. Judge White, she actually testified that this, and this is going back to your further question, and I apologize about the confusion. The package of documents The lawyer gave it to you? Gave it to her. The lawyer gave it to her? Correct. And she rubber stamps them. And the lawyer, okay, it's not a matter of rubber stamping them. I mean, she never said these documents are the records of some particular agency, right? They were given to her from the lawyer, and she assumed maybe he got them from the historical archives. No, no. I mean, there was no testimony he got them from historical archives in this case. Didn't she say, I don't know, maybe he got them from there? Might have. I mean, it was a guess. Okay, so listen to my question. I'm sorry. Go ahead. And the lawyer never produced anything from the archive people saying, yes, on this day, I produced these documents. Exactly, Your Honor. That's our point. They come from some closet somewhere. But once again, this is an admission, this is an evidence admission thing, and we're judging that by an abuse of discretion, right? Well, it's the de novo analysis on this goes. De novo goes whether the evidence adds up to something. But what we're really talking about here now is whether this is evidence or not. Whether the district judge should have reviewed this stuff or not. Well, it's pretty clear that Judge Katz immediately allowed them to expand the record farther than what we thought, but we don't think it even gets close to meeting it now. Had these records come from the Ohio Historical Society, as Justice White mentioned? Had she been able to verify with a signature, a stamp, a marking, some kind of identification? Here's an important point. Judge Boggs, you brought up that one exhibit about the one in question that has the second page. The witness was not able to – the first page was the type of document she received and she identified this looks like the type of documents we would get. The second and third page, she could not verify. And the page that Your Honor was referencing that has our crossing on it, the witness who claims personal knowledge couldn't say that I recognize this document at all. As a matter of fact, she said this isn't required by the program. What the appellants want – Sorry, the one that's not required is the K? The exhibit L, the one that you said is 2892. The second page, 2893. And 2894, the one that actually identifies the crossing by number, she specifically said she cannot identify those. Those are not required by the program and she cannot identify those pages. So as a matter of fact, what it sounds like is they're putting documents in front of her and asking her to sign these to her best of her knowledge, but when she's actually asked the best of her knowledge, she says I can't identify this specific document. And it's the critical document because it's the one with the crossing in question. The same – The crossing in question, is there any doubt that this 262061N is the crossing in question? No, there's no doubt that is, Your Honor. And I see my time is up and I finished your question. Go ahead. The 262061N in the exhibit that we talked about, K today, is clearly the crossing. And what are we – what the appellants want – And there is a line number on page ID 2907 with exactly that number with exactly $846 indicated. Right. They're coming from the defense and the defense knows what the numbers they need to add up to it. And there's no verification that she got it. And on the actual exhibit K, there's no stamp or anything that she got this either. So they're creating the documents, Your Honor. Thank you. You have your time for rebuttal. Thank you. Well, if they're creating documents, then you are saying they're forged. Not necessarily forged, Your Honor. There's a second corporation. There's a first corporation, Conrail, that's defunct. And there's a second corporation, CSX, that's taken it over from the first one. Who knows the accounting of the first organization? And is forgery possible? In this day and age, that's why we have to have some reliability to the documents. Not saying it happened. Does it happen? Certainly. And that's why a peer isn't enough. Okay. I'll hear from your adversary. Good morning, Your Honors. Andrew Tauber on behalf of CSX. The District Court was surely correct when it found that the evidence introduced on remand of federal funding of the Ulsh Road crossparks was, quote, overwhelming. And there is no doubt that this evidence is, in fact, overwhelming. Why isn't there some authentication of these papers? Your Honor, the authentication is in multiple ways, Your Honor. Looking first to Exhibit L, which is the exhibit containing the invoice. This is self-authenticating, first of all, under Federal Rule of Evidence 902, Subsection 7. It is what the District Court found, that this invoice is self-authenticating because it bears a sign, namely the Conrail logo, and is reported to be done in the course of business. So there is no need for any... You don't even know where it came from. I can tell you, Your Honor. We know from the deposition where it came from. No, the deposition, she said, it came from the lawyer. Yes, Your Honor. It's the CSX lawyer. What she testified was, was that ODOT purged its files some numbers of years ago, sent some of the files to the Ohio Historical Society. But since the Supreme Court's decision in Shanklin in the 1990s, railroad lawyers have been amassing the documents necessary to prove the preemption defense, precisely because you need to assemble lots of documents. So the trial lawyer for CSX has in his possession the relevant documents that show the... Why couldn't that be part of the record? Your Honor, when asked by Plaintiff's Counsel where did these come from, she said, from the lawyer who prepared the affidavit. That is the testimony. It came from CSX's lawyer. There's nothing wrong with CSX holding relevant documents. So you're saying that they came from CSX's files? Yes, Your Honor. Yes, exactly so. But that's not in the record. Your Honor, we can each read the deposition. When at pages, I believe it's 3039 to 3040 in the record, you will see Plaintiff's Counsel saying, where did these documents come from? She says, they were presented to me. I think that my lawyer, the ODOT lawyer, received them from the lawyer preparing the affidavit, which is exactly true. That's all she has... The only thing she can tell us is who gave them to her. That's all. No, but that's not all she told us, Your Honor. She looked at these documents and said, yes, this is exactly the sort of invoice that my office would have received. Could she identify this particular invoice 20 years later? No, of course she couldn't. That's the whole point. She answered that as to one page, not the other material. But, Your Honor, there are multiple ways in which documents can be authenticated. I don't understand why there would not be something on the record from the lawyer saying, yes, these were in the files. Yes, these came from... Because there was no dispute. The witness said these came from the lawyer. Plaintiff's Counsel didn't dispute it. We certainly didn't dispute it because that's the truth. What more do we need to show where these files came from other than... Because it's not enough that it came from the lawyer. The lawyer has to say where it came from. Your Honor, no. The rule... Your Honor's question is about authentication. I'll get to your exact question in a moment. Let me just back up for a second, if I may. Documents can be authenticated in multiple ways. One way is without any extrinsic evidence whatsoever, if they are self-authenticating, which, in fact, these invoices are under 902 sub 7 as the District Court correctly found because they bear the logo of Conrail and were purported to be prepared in the course of their business. So they're self-authenticating. We need absolutely no external evidence to authenticate the invoices. But beyond the fact that they are self-authenticating, they are actually authenticated by extrinsic evidence in multiple ways. For example, they are authenticated under 901B1, which calls for the testimony of a witness with knowledge. Ms. Kirkland testified, as at page 3112 of the record, that these invoices certainly appear to be the type of bills that would be submitted to the Ohio Buckeye Crossbuck Program. Now, when she said that, these invoices, what was she referring to? Exhibit L, Your Honor. All of Exhibit L? Yes, Your Honor. They were also independently authenticated under Federal Rule of Evidence 901B sub 4, which allows authentication through the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item taken together with all the circumstances. Well, that surely authenticates these invoices, Your Honor. They have, again, the appearance, the Conrail logo, which is the invoice from Conrail. The contents and the substance of the invoice, they are backed up by line item detail that corresponds exactly to the figure on the invoice. They are, according to Ms. Kirkland, directed to the proper person at ODOT. And, moreover, when you look... Mr. Honefinger? Yes, Your Honor. And when you take all of the invoices in Exhibit L together, they total $892,124. And we have then the testimony and the documentary evidence from Mr. Downs, who stated that the State of Ohio, ODOT, in fact, reimbursed Conrail for precisely that amount, $892,124. This whole thing, if I read this correctly, the Ulsh Road crossing is $846. Yes, Your Honor. One might think... I think it's $846 or $843, but regardless... I'm looking at $846. One might say it seems odd that this $846 controls this tort suit that could be worth millions, but that's what preemption is. But you're saying, we know that there's this big program with $800,000. We know that there's a subset of $19,000. Yes. And we have what purports to say that this number that is the Ulsh Road number is $846 of that. Is that fair? That is part of the evidence, Your Honor. We have much more than just that. We have the proposal from ODOT to the federal government that the Ohio Buckeye Crosswalk Program be instituted. We have... When they do that, is Ulsh Road listed as part of it? No, it is not, Your Honor. It's not specifically listed. It clearly didn't make up the whole program. No, it clearly did not make up the whole program. We have evidence that the federal government did, in fact, authorize the program and, in fact, disbursed the funds to ODOT. We have the Exhibit K, which is the actual installation form. This is an ODOT form. Ms. Kirkland testified with respect to Exhibit K, which is the Ulsh Road installation form, that this is the form that Conrail would have submitted with their invoice for reimbursement in the Buckeye Crosswalk Program. That's at pages 3074-75. The only problem, allegedly, with that is that she doesn't say that, in fact, I got this. It's just the kind of paper that... But, of course, Your Honor, authentication is a very, very low standard. It simply has to be some evidence that the document is what it purports to be. And we have far more than just a scintilla of evidence. Any discussion of who D.L. Richards is? Not to my knowledge, no. But the person who I believe is on the spot installing. Your Honor, I... I just meant, you know, if you were... If you were lawyering this to the extreme, you would go find Mr. Richards or his gravestone and show that he was an employee at the relevant time. Yeah, but it's important to remember these are ancient documents. They're admissible under Rule of Evidence 803-16 because they're more than 20 years old. And it's precisely the notion behind the ancient documents exception to the hearsay rule is that over time, people's memories will fade, people will die, people will leave the employ of the institution. Can you say how it would be useful to find out where that document came from? Your Honor, I know exactly where it came from. I'm telling you, it came from our files. From... CSX's files. There's no misreads. In the deposition... They got as the heir to Conrad. Yes, Your Honor. Exactly. I think, you know, railroad lawyers throughout the state who do these railroad crossing cases maintain files for their clients because they'll know they'll need to prove them up. They say, okay, here are the documents. They go typically to Ms. Kirkland who fills out an application. She doesn't rubber stamp If you look at the testimony, she says, I look at it, I make sure it's accurate, and if it's not accurate, I don't sign. It's not rubber stamping. She looks at it. She receives the documents from the files held by the lawyers because she doesn't have any files anymore, Your Honor. ODOT got rid of the files. She couldn't take these things out of her own files because they don't exist. The only place these documents exist is in the lawyers' files. That's exactly where you would expect to find them if they were authentic. So we satisfy that prong of authentication under F.R.E. 901 sub B sub 8 which goes to authentication of ancient documents. But again, let me emphasize, Your Honor, that a document can be authenticated in multiple ways. Self-authentication, authentication through testimony of a witness who says, yeah, that's what it should be, which is what we have here, through all of the circumstances, the appearance, and the contents. And we look at the massive evidence that we provide. We provided the contract between ODOT and Conrail. We provided the federal authorization for the construction pursuant to that. We provided the invoices. We provided the installation sheet, each of which cross-references the other. You see consistently throughout the reference to the contract number with Conrail. You see consistently throughout the reference to the two federal funding numbers. And all of these documents are self-referential. Which you gave some word names. The 262061N. That's the Ulsch Road. The Ulsch Road itself. And we see that on the Ulsch Road. You referred to different names to the numbers. What's the name for that number? That's an AARDOT number. AAR is American Association of Railroads. You referred to, I have to go to the transcript. You said invoice number. You said some other kind of number. The various documents that are attached as exhibits A through L overlap in mutually corroborating ways. Multiple exhibits refer to the contract number between ODOT and Conrail. Multiple exhibits refer to the federal funding codes that were used with respect to that contract. Those were the two things. Multiple documents refer to the Ulsch Road number and Ulsch Road by name. Moreover, we have the testimony and the documentary evidence provided by Mr. Downs who says that Conrail was in fact reimbursed out of federal funds for the sum of $892,100. Mr. Downs, they raise a point as to whether the district court could sort through all the confusion at the time of the argument that if there's new confusion after that, they shouldn't sort through it. So talk about why the Downs affidavit is in there and what's new and the 66 pages that he refers to of the Kirkland affidavit that's new. Certainly. First of all, I reject the suggestion that there's any confusion whatsoever. There's none. It's absolutely clear that the Ulsch Road crossing was federally funded and installed as the testimony and the documents suggest. But this court in this previous decision remanded, and I'm quoting now, remanded the case back to the district court to consider the issue of federal preemption in light of the evidence properly placed on the record. This court in that same decision found that there was no evidence properly in the record on the first go-round through our inadvertent failure to file the affidavit. So the remand could not conceivably mean that the district court was to consider preemption in light of the evidence that was properly placed on the record because the court had found that there was none. So surely the scope of remand is for the district court to consider federal preemption in light of evidence that on remand is properly put in the record. And that is indeed exactly what the district court did. And having gone through this once before and having made a few sloppy errors, for which we apologize to this court and the district court, we wanted to make sure that we dotted our I's and crossed our T's this time around. So we were extremely careful to get all the documents we thought would be necessary and sufficient to establish federal funding for the Ulsh Crossing, which we did. The additional pages are instead of only presenting the invoice for the Ulsh Road Crossing, we presented all of the invoices from Conrail to ODOT under the Buckeye Cross Buc program, and then got the testimony and the testimony of Senator Downs, who is responsible for actually dispersing the funds, or whose office was responsible for dispersing the funds, and showed that indeed the amount shown on the invoices submitted by Conrail equaled exactly the amount that the state dispersed from federal funds to Conrail. I hate to throw this in, but wasn't there an issue about rounded numbers and... That is a made-up issue by plaintiff's counsel that is designed to confuse the district court. I'll answer in some detail in a moment, but the exact numbers are so complicated, I would direct your honor's attention to pages 12 to 14 of our reply brief in the district court, where we go through and show why that is just malarkey. What it is, is that there is an 8% retainer held back by the state on each invoice up until the very end. So, as we submit... The invoices are to the penny, but they're holding back 8%, so the amount that's paid on each invoice up until the very end is 8% less than what was invoiced. At the very end, pursuant to the contract, page 5 of the contract, which is in the record, the state said, okay, you finished the work, here's the 8% that we were holding back. So, at the end, the sum total of all the invoices, $892,124, equals exactly to the penny. The rounding was in the holdback. They didn't do 8% exactly. That was just made up by plaintiff's counsel. There were payments that were in round numbers. The total number at the end... If my memory serves me correctly, there was one payment that was off by 2 cents in the rounding. I think that's literally the extent... 8% is the money you might have fractured. Your Honor, it's lots of numbers. I can't stand here and do this extemporaneously, going through each and every invoice, but again, I direct your attention to the reply brief in the district court, where we go through and lay out exactly each payment, exactly each invoice, and it adds up perfectly. And the testimony from Mr. Downs is that, yes, indeed, if there is a retainer, which there is, as the contract shows at page 5 of the contract between ODOT and Conrail, that explains any discrepancy that might have been raised by plaintiff's counsel. Anything else, judges? Thank you. Time for rebuttal. Real quickly, the appellee seemed shocked at the question of whether or not the affidavits were accurate. I think 4 affidavits speaks for itself that there's at least questions as to the accuracy of the affidavits. If there has to be 4 of them trying to all claim the same thing with different documents, some missing, some not missing. I think that question speaks for itself. The $892,124, we're not disputing that, that wasn't spent. But it hasn't stood up here and explained that one of the invoices in this case didn't bear Conrail's number at all. Conrail, we're assuming collectively that Conrail was 191680 because 15 or 16 of the invoices in the file said that number. One invoice said 180810 for $9,490 Susan Kirkland testified unequivocally, if it did not have the right number on it we would not have paid it. My department would not have paid that. So the numbers don't just clearly add up. And he has not explained when these changes, these alterations are made. The other thing that the counsel said that I don't think is in the record. He talked about these records being I see the one on page 2906 that you were referring to. Others? Yes, Your Honor. There's also a similar alteration on 2982. Similar you mean in the same number? There's a 161680 at the bottom and 191680. Okay, fine, got it. Thank you. So three of them have that. But the point is if the documents are reliable on their face, we don't have to question further or at least there's an issue of reliability. An issue that the document itself doesn't even have the right number on it. She needs to answer the question. I know where these got from. I wanted to address something that counsel said that I don't think is in the record. He said that some of these records were purged and they're not available there. That's not in the record of this case. Susan Cookland testified that she believed that the records they had were either still at her department, some, and the rest were at the Ohio Historical Society. There's no testimony from her that we purged these so we have to use the lawyer's records and it sounded like he was creating that inference for the court. The Ohio Historical Society would be the place to get these rather than CSX and as Judge Wright properly pointed out, if the lawyer was going to bring these documents before this court, they should have brought somebody from CSX to say, I had these in the ordinary course of business. Nothing is more fundamental for the hearsay is that someone maintained them in the ordinary course of business. We don't have that in this case. We don't have any testimony. If I know that the bills that I'm trying to add up to are $10 and I need to put them in evidence, I can come up with $10 of bills. And by the way, the numbers don't even add up here. So, are you saying that they're not self-authenticating? I am, Your Honor. They're not self-authenticating because in this day and age, without some testimony as to where they come from. And do you dispute that the lawyer got them from CSX files? I don't think it's in the record that he got them from CSX files. The lawyer said that today, but that's not in our record. I don't think that's part of the record in this case. That was testimony before this court that I don't think anywhere in this... Do you argue to the judge that we don't know where these records came from? Absolutely, Your Honor. We argue that, first of all, that these records are... There's no foundation for these records. These records are hearsay. They're not contained in the files of her. And she said that I cannot identify him. And all of this was before Judge Katz. And here's the ultimate... And therefore he abused his discretion in considering them. That's what you have to get to. I believe he did abuse his discretion. And here's what this case will stand for if this court affirms his decision. It's okay for the witness to say they appear to be the type of documents we would have received on information and belief. And to the best of my knowledge, they are. Without a scintilla of evidence that, in fact, she got the critical ones. Thank you, Your Honor. The case will be submitted, and the clerk may call the next case.